SYLVESTER R. HATHAWAY, Appellant, *v.* GIDEON R. PAYNE,
Respondent.

Whether a deed, executed and not delivered immediately, but handed to a
stranger to be delivered to the grantee at a future time, be an *escrow* or a
deed of the grantor *presently*, depends upon the intent of the parties thereto.

Where the future delivery of the deed to the grantee depends upon the perform-
ance of some condition, it is an escrow.

Where it is only to wait the lapse of time, or the happening of some contin-
gency, it is to be deemed the grantor's deed *presently*.

Where the deed is to be delivered to the grantee on the death of the grantor,
the title, by relation, passes at the time the deed was left for delivery.

THIS action is trespass, for cutting down and carrying away
trees ; was tried at Ontario Circuit, by a judge without a jury.
Judgment was given for the defendant for costs.   This judg-
ment was affirmed at General Term in the Sixth District,
from which an appeal was brought to this court.

The judge at the trial found the following facts :

" That the deed from Gideon Payne and wife to the defend-
ant, a copy of which is hereto annexed marked A, the bond
of defendant to them, a copy of which is hereto annexed,
marked B, and the bond of Gideon Payne and wife to defend-
ant, a copy of which is also hereto annexed marked C, were
simultaneously executed on the 25th of November, 1839.

" That the defendant did provide for and support the said
Gideon Payne and wife, to their satisfaction, during their
natural lives, and that no demand was made by them or
either of them of the sum of thirty dollars per annum, to be
paid to them or either of them, upon demand as specified in
his bond.

" That the said four thousand dollar mortgage mentioned
in the defendant's bond as having been executed by Gideon
Payne and the defendant to George Payne, covered the
Burnett lot, embracing the premises in question, and forty
acres of other lands embraced in the deed of the 25th of
November, 1839, and that the said bond bearing even date
with the said mortgages was paid by the defendant, and the

mortgage satisfied of record on the 22d day of February, 1856.

" That on the fourteenth day of February, 1848, the defendant executed and delivered to Gideon Payne a certain quit-claim deed, a copy of which is hereto annexed, marked D.

" That Gideon Payne made and duly executed his last will and testament on the 27th day of September, 1845, conferring upon his executors appointed by the will, full power after the death of his wife to sell and convey the real estate of which he should die seized.

" That he died on the 23d of November, 1848. That his will was duly proved and recorded on the third day of March, 1849, and letters testamentary issued to his executors.

" That his wife survived him, and died on the third day of April, 1854.

" That his executors afterwards, and on the 22d day of June, 1854, granted and conveyed to the plaintiff, the premises in question, being a certain lot of land in Farmington, Ontario county, described in the deed and bonds hereto annexed, respectively marked A, B and C, as the Burnett lot.

" That the Burnett lot contains ninety-two acres of land, one-half of which was, on the fourteenth day of February, 1848, wood and timbered land, and the other half improved.

" That the plaintiff, soon after the said premises were conveyed to him, entered into possession of the improved portion thereof.

" That the defendant afterwards cut and carried away from the wood and timbered portion of the premises, ten living trees, ten decaying trees, and ten dead trees, of the value of fifty dollars."

It was admitted on the trial that the deed from the testator and wife to defendant, remained in the possession of Edward Herrendeen until after the death of defendant's mother, and that in April, 1854, it was delivered by said Herrendeen to defendant. Also, that the deed from the defendant and wife to the testator, was delivered to the testator at the time of its date.

It was proved on the trial, and was undisputed, that the parents of the defendant lived with him the latter part of their lives, that his father, the testator, died there; his mother lived there until a short time before her death; she went to visit another son who was sick; she was taken ill there and died there. The $4,000 mortgage, paid, satisfied and discharged of record, was produced by the defendant in evidence on the trial. The deed A, referred to by the judge in his finding, was a deed of warranty with covenants for two parcels of land; the second described parcel are the premises in question, and are described as the one equal undivided third part of ninety-two acres of land, called the " Burnett lot," in Farmington, in the county of Ontario, and the consideration expressed therein was $9,000; the quantity of land was stated in the deed to be 181⅔ acres. The facts and circumstances relating to the delivery of this deed are found detailed in the recital and condition of the two bonds, one given and executed by Gideon Payne and Phebe his wife, to the defendant, and the other given and executed by the defendant to his father, both bearing even date with the said deed. The penalty of the first mentioned bond being $5,000, the second named bond in the penalty of $10,000. The recital and condition in the first bond are as follows :·

" Whereas, the said Gideon R. Payne has this day executed to the said Gideon Payne and Phebe Payne, his wife, a bond in the penal sum of ten thousand dollars, conditional for the maintenance and support of him, the said Gideon Payne, and Phebe his wife, during their lives, or the life of either of them, and the payment to them or either of them, the sum of thirty dollars annually hereafter, upon their request only, for expense money, also for the full payment and satisfaction of a certain bond and mortgage this day executed by George Payne, for four thousand dollars and interest, by the said Gideon Payne and Gideon R. Payne, and a further consideration of said bond is, that the said Gideon R. Payne shall surrender the possession of all the lands, together with the hereditaments and appurtenances thereunto belonging, which are included in the deed this day executed by the said

Gideon Payne and Phebe his wife, to the said Gideon R,. Payne, being about 181¾ acres of land, which deed is to be and remain in the possession of Edward Herrendeen, of Farmington, during the lifetime of the said Gideon Payne, and Phebe his wife, or either of them, whenever and as soon as he, the said Gideon R. Payne, shall neglect or refuse to maintain and support him, the said Gideon Payne, and Phebe his wife, or either of them, in a manner that shall be satisfactory to them.

"And whereas, it is the mutual agreement between the parties to these presents, that the said Gideon R. Payne is to have the full use and control (for his benefit) of all the lands embraced in the deed to be and remain in the pos-session of Edward Herrendeen, as before referred to, and in addition thereto, the said Gideon R. Payne is to have the use and control of the remainder of the Burnett lot, so called, being the two undivided third parts of ninety-two acres, not included in the said deed in the said Herrendeen's possession, for his use and benefit, together with the hereditaments and appurtenances thereunto belonging, excepting so much of the dwelling house on the home farm as the said Gideon Payne and Phebe his wife, may wish to require for their comfort and convenience; and whenever the said Gideon R. Payne shall pay to the said Gideon Payne and wife the sum of two thousand dollars, he, the said Gideon R. Payne, is to receive a good and sufficient deed from him, the said Gideon Payne and wife, of the two equal undivided third parts of ninety-two acres of land, being the west part of lot No. 81, in Farmington, called the Burnett lot. Now, therefore, the condition of this obligation is such, that if the above bounden Gideon Payne and wife shall let the said Gideon R. Payne have the full use, occupation and control of the home farm and the Burnett lot, so called, now owned by him, the said Gideon Payne, containing, by estimation, in both pieces or tracts, 243 acres of land, for his use and benefit, together with the hereditaments and appurtenances thereunto belong-ing, so long as he, the said Gideon R. Payne, shall maintain and support him, the said Gideon Payne, and wife, in such

manner as shall be satisfactory to them, reserving only so much of the dwelling house on the home farm in lot No. 63, in Farmington, as he, the said Gideon Payne, and wife may wish for their comfort and convenience, or either of them. And a further condition of this obligation is, that whenever and as soon as the said Gideon R. Payne shall pay the just and full sum of two thousand dollars to him, the said Gideon Payne and wife, or either of them, then they shall execute and deliver to him, the said Gideon R. Payne, a warranty deed of the two equal undivided third parts of 92 acres of land, being the west part of lot No. 81, in Farmington, called the Burnett lot, without any fraud or other delay, then this obligation to be void and of none effect, otherwise to be and remain in full force and virtue.

"GIDEON PAYNE, [L. S.]<br>"PHEBE PAYNE.  [L. S.]"

The terms, conditions and recitals of the second bond are as follows:

"Know all men by these presents, that I, Gideon R. Payne, of Farmington, county of Ontario and State of New York, am held and firmly bound unto Gideon Payne and Phebe Payne his wife, of the same place, in the sum of ten thousand dollars, lawful money of the State of New York, to be paid to the said Gideon Payne and Phebe Payne, or to their heirs, executors, administrators or assigns, to the which payment, well and truly to be made, I bind myself, my heirs, executors and administrators, and each and every of them, firmly by these presents, sealed with my seal, dated the 25th day of November, 1839.

"Whereas, the said Gideon Payne and Phebe Payne his wife, have this day executed and acknowledged a warranty deed to the said Gideon R. Payne, of two several tracts of land, viz.: The first tract of land is estimated to contain one hundred and fifty-one acres, be the same more or less, and is all of lot No. 63, in Farmington, being the home farm of the said Gideon Payne, excepting about 21 acres, conveyed by the said Gideon Payne and wife to George Payne, in two separate warranty deeds, one executed some time since con-

veying 18 acres from the west side of said home farm, or lot No. 63, and the other of this date, supposed to convey about three acres, be the same more or less. The second tract of land this day conveyed to the said G. R. Payne by G. Payne and wife, is described in said deed as the one undivided third part of 92 acres of land which the said Gideon Payne now owns, in the west part of lot No. 81, in Farmington, called the Burnett lot. The consideration of which deed to the said G. R. Payne is $9,000, as conveying by estimation 181 acres and two-thirds of an acre of land, be the same more or less. And whereas, it is the mutual agreement between the said Gideon Payne and Phebe Payne of the one part, and the said G. R. Payne of the other part, that the said deed shall not be delivered to him, the said G. R. Payne, during the lifetime of the said G. Payne and Phebe Payne, or either of them, but shall be and remain in the possession of Edward Herrendeen, of Farmington, or his executors, administrators or assigns, to be by him, the said Edward Herrendeen, or his executors or administrators, delivered to him, the said G. R. Payne, or to his heirs, executors or administrators, immediately after the decease of him, the said G. Payne, and Phebe Payne his wife, as a good and valid conveyance of all the lands therein contained.

"Now, therefore, the condition of this obligation is such, that if the above bounden G. R. Payne, his heirs, executors or administrators, do, and shall from time to time, and at all times hereafter, during the natural lives of the said G. P. and P. P. his wife, or either of them, well and sufficiently maintain and support, or cause to be well and sufficiently maintained and supported, the said G. P. and P. P. his wife, in the now D. house of him, the said G. Payne, or at such other place or places as they, the said G. Payne and P. P. his wife, or either of them, may hereafter select, with meat, drink, clothes and all other things necessary and convenient for them or either of them, in sickness or in health, and shall also pay to the said G. P. and P. Payne his wife, or either of them, such sum of money as they may wish for expense money, not exceeding in any one year the sum of

$30, and only to be paid upon their request, or the request of either of them. And a further condition of this obligation is, that the said G. R. P. shall fully pay and satisfy the bond and mortgage of $4,000, this day executed by Gideon Payne and G. R. Payne to George Payne; and whenever the above bounden G. R. Payne shall refuse or neglect to support the said Gideon Payne and Phebe Payne his wife, or either of them, in a manner that shall be satisfactory to them, he, the said G. R. Payne, shall thereupon, at the request of him, the said Gideon Payne, or Phebe his wife, surrender to them, or either of them, the full possession of all the lands embraced in the deed above referred to, as being in the possession of Edward Herrendeen, together with all the hereditaments and appurtenances thereunto belonging, all which being fully and faithfully performed, by the above bounden G. R. Payne, his heirs, executors or administrators, according to the true intent and meaning thereof, without any fraud or other delay, then this obligation to be void and of none effect, otherwise to remain in full force and virtue."

The above conveyance and contract were afterwards changed and modified by another deed, bearing date the 14th February, 1848, executed by Gideon R. Payne and Maria B. his wife, to his father, Gideon Payne. This latter deed refers to the former one by its parties, date and other references, as follows:

"This indenture, made the fourteenth day of February, in the year of our Lord one thousand eight hundred and forty-eight, between Gideon R. Payne and Maria B. his wife, of Farmington, Ontario county, N. Y., of the first part, and Gideon Payne, of the same place, of the second part, witnesseth, that the said parties of the first part, in consideration of the sum of one thousand dollars, and of the enjoyment of the reservations hereinafter contained and made to them, in hand paid by the said party of the second part, the receipt whereof is hereby confessed and acknowledged, have bargained, sold, remised, and quitclaimed, and by these presents do bargain, sell, remise, and quitclaim unto the said party of the second part, and to his heirs and assigns forever, the undi-

vided one-third part of ninety-two acres of land in the town of Farmington aforesaid, taken from the west part of lot number eighty-one in said town, and called the Burnett lot, being the same land that was conveyed to Gideon R. Payne by the said Gideon and wife on the 25th of November, 1839, by a deed now in the possession of Edward Herrendeen : also the use of the other two-thirds of said Burnett lot, as granted to said Gideon R. by said Gideon and wife, by a certain agreement dated on the day said deed was given and executed at the same time of said deed; reserving, nevertheless, and the said Gideon R. does hereby reserve, the free use, occupation and enjoyment of the whole of said premises and crops thereon, until the first day of November next; reserving, also, unto the said Gideon R., his heirs and assigns forever, all the fallen trees and timber on said Burnett lot, and that may hereafter be blown down, with the right and privilege to cut and take the same away, and all the dead and decaying trees and timber that now is or hereafter may be on said Burnett lot, with the full right and privilege to cut and take the same away at any time, doing no unnecessary damage to said premises; none of the live trees or growing timber on said Burnett lot to be cut hereafter by any one. The enjoyment of the reservations herein contained are expressly declared to be a part of the consideration for this conveyance, and neither the grantor or grantee nor their assigns to be permitted to cut on the said Burnett lot any of the growing timber thereon, but the same is to remain for the benefit of the grantor and his assigns, to be used as aforesaid, together with all and singular the hereditaments and appurtenances thereunto belonging or in any wise appertaining; and the reversion and reversions, remainder and remainders, rents, issues and profits thereof, and all the estate, right, title, interest, claim and demand whatsoever, of the said party of the first part, either in law or equity, of, in and to the above bargained premises, with the hereditaments and appurtenances : to have and to hold the said premises above described, subject to the above reservations, to the said party of the second part, his heirs and assigns, to the sole and only proper

benefit and behoof of the said party of the second part, his heirs and assigns forever; provided the said party of the first part, his heirs and assigns, enjoys the full privilege and benefit of the above reservations."

*E. G. Lapham,* for the plaintiff.

*T. R. Strong,* for the defendant.

POTTER, J.   I find no such obscurity of expression on the face of the deed, and of the two bonds of the date of the 25th November, 1859, between, Gideon Payne and wife and their son, Gideon R. Payne, the defendant, as creates a question as to their real meaning.   There is no difficulty, therefore, of determining the meaning, intent, and legal effect of those instruments.   They may, and should, be read together, as if they were in one instrument.   Reference is made in the bonds of both parties to the deed of the same date.   They explain each other, and make one good contract. (*Coddington* v. *Davis,* 1 Comst., 186; *French* v. *Carhart,* id., 96; *Rodgers* v. *Kneeland,* 13 Wend., 115; *Cornell* v. *Todd,* 2 Denio, 133.)

Thus reading these papers, it is clear that the intent of the parties to them was, in the first place, to execute a present conveyance, by the grantor and his wife, of what is called the home farm, and of an undivided third of the "Burnett farm," in fee, to the defendant, which, together, amounted to about 181⅔ acres of land.   It is equally plain, that in addition to this grant in fee in the deed, the contract set forth in the bond was an agreement to let the defendant have the use and control of the remaining two-thirds of the "Burnett lot" (not conveyed in the deed), to be held subject to the condition specified in the same agreement.   And there was the further agreement, on the part of Gideon Payne and wife, that, at the option of the defendant, he should receive a conveyance by a good and sufficient deed from the said Gideon Payne and wife, of the remaining two undivided third parts of the "Burnett farm," whenever the said Gideon R. should pay the said Gideon and wife the sum of $2,000.   So, too, no part of the consideration of this agreement having been paid down,

the agreement in this respect being executory, it is just as clearly provided for the manner of paying the consideration. First, it provided that Gideon R. should maintain and support the said Gideon Payne and his wife, or cause them to be well and sufficiently supported, in such manner as should be satisfactory to them, at such place, or places, as the said Gideon and his wife, or either of them, might select thereafter, with meat, drink, clothes, and all other things necessary and convenient for them, or either of them, in sickness or health, and should also pay them, or either of them, such sum of money as they should wish for expense money, not exceeding in any one year the sum of thirty dollars, to be paid only on their request, or on the request of either of them. Second, the said Gideon R. was to pay and satisfy a bond and mortgage of $4,000, which, on the same day, was executed by said Gideon and Gideon R. to George Payne (which covered a part of the premises described in the aforesaid deed); and, *Third*, as a part of the consideration, was the reservation to Gideon Payne and his wife, and to either of them, of so much of the dwelling-house on the home farm as they, or either of them, might wish, for their comfort and convenience. So it is also clear, that the conveyance by the deed was, in its terms, absolute, and the payment of $4,000 of the consideration was also absolute, and depended upon no condition or the performance of any stipulation. The *possession* of the farm conveyed, and the possession of the remainder of the Burnett farm not conveyed, during the life of Gideon Payne and wife, was a part of the consideration that depended upon the performance of the stipulation on the part of Gideon R. above specified, to the satisfaction of Gideon and wife. The *failure* to perform the said stipulation, on the part of Gideon R., as a part of the consideration, was provided for; it subjected him to the loss of the possession of the lands conveyed, as well as of the possession of the two undivided third parts of the Burnett farm, held under the agreement set forth in said bonds. *This* was the *specific* penalty and consequence provided in the agreement for a breach of it, in the particulars specified; and there was no other forfeiture or penalty

than this. So far, no question can arise as to the terms of the agreement. The effect of this agreement, we shall presently examine. Its character was an *executory* agreement for the sale of lands. There was one other provision in this agreement, upon which all the question arising in this action is based. All the agreements which we have noted were the several and separate covenants of the parties. This is a *mutual* agreement—the agreement of both parties; that is, of Gideon Payne and Phebe his wife of the one part, and Gideon R. Payne of the other part, and is the only stipulation that is *mutual*. It is this: "That the said deed shall not be delivered to Gideon R., during the life of Gideon and his wife, or either of them, but shall remain in the possession of Edward Herrendeen, of Farmington, or his executors, administrators or assigns, to be delivered to the said Gideon R. Payne, his executors, administrators or assigns, *immediately after the decease of the said Gideon Payne and Phebe his wife, as a good and valid conveyance of all the lands therein contained.*" It may be remarked, that the agreement, in terms, provided no *condition*, or contingency, to prevent or defeat this *delivery* at the time mentioned, nor in its effect, that it was *then* to become a good and valid conveyance. By virtue of this agreement, Gideon R. Payne entered into the possession of all the lands conveyed and let. This was a good and valid agreement, based upon a good and valuable consideration, sufficient, in the absence of fraud, to support a conveyance, if made, or to compel specific performance on a refusal to convey. The conditional feature of the stipulations in the agreement did not change its effect in this regard. Those stipulations were a part of the consideration to be paid. As the facts are found by the court, all the stipulations, covenants and agreements on the part of the vendee, which were the consideration of the agreement, were fully kept and performed by the defendant. Had no deed been executed, a mere agreement to convey, under such circumstances, would have been specifically enforced by the court in his behalf, on such a contract.

Except as to its peculiar provisions, and the fact of an actual execution of the deed, this was an ordinary contract for the conveyance of lands on the payment of the purchase-money. This execution of the deed makes it one step nearer to a consummation, and is the stronger evidence of its being an absolute and not a conditional agreement. It was to *deliver* the deed already executed, instead of executing one on the performance of stipulation. The payment of the purchase-money but confirms this view. It was clearly a sale by the one, and a purchase by the other. If the vendor in this case retained the title for any purpose, or, if the deed lacked absolute delivery, it could only be as a kind of implied security for the performance of stipulations on the part of the vendee. It is now too well established to be questioned, that the interest of a vendee in such case in the *contract*, is *real estate*, and in case of his death, it descends to his heirs, and not to his executors or administrators; and it is devisable as real estate. (*Champion* v. *Brown*, 6 Johns. Ch., 398; *Griffith* v. *Beecher*, 10 Barb., 434; *Rood* v. *New York & Erie R. R. Co.*, 18 id., 83; *Moore* v. *Burrows*, 34 id., 174; *Smith* v. *Gage*, 41 id., 60.) The vendor in such case is deemed in equity to be the trustee for the vendee of the title, and the vendee is the trustee of the vendor for the purchase-money. The money due on the contract is treated as personal estate of the vendor; and in case of his death it goes to the executors or administrators of the vendor, and does not descend to the heir (Story's Eq. Jur., §§ 1212, 1214), and every subsequent purchaser from either, with notice, becomes subject to the same equities as the party would be from whom he purchased. (Id., §§ 789, 790, 792.)

It is necessary to show this relation of interest between the parties to this contract of the date of November, 1839, in order to see how it was affected by the modification of it, made by the deed of the defendant of the date of 22d of February, 1848.

This last conveyance, it will be remembered, was a quitclaim to Gideon Payne from Gideon R. Payne, of the undivided one-third interest of Gideon R., in the title of the

"Burnett lot" only. The right to the possession, use and enjoyment of the remaining two-thirds of the lot was also released by this deed. The question that arises, and which is the principal question in the case, is, *upon the effect of the reservation contained in this deed.* The defendant reserved to himself, his heirs and assigns forever, all the fallen trees and timber on said "Burnett lot," and that may hereafter be blown down, with the right and privilege to cut and take the same away, and all the dead and decaying trees and timber that now is, or hereafter may be on said "Burnett lot," with the full right and privilege to cut and take the same away at any time, doing no unnecessary damage to said premises; none of the live trees or growing timber on said Burnett lot to be cut hereafter by any one. The *enjoyment* of the reservations herein contained, are expressly declared to be a part of the *consideration* for this conveyance. And neither the grantor or grantee, nor their assigns, are to be permitted to cut on said Burnett lot, any of the growing timber thereon, but the same is to remain for the benefit of the grantor and his assigns to be used as aforesaid." And this grant was to be held by the grantee "*subject to the above reservations.*"

This raises the question, what rights had the defendant at that time in the "Burnett lot" to convey? What rights could he reserve, and what was the effect of reservation in a deed poll of interests which the grantor did not own, where the deed is accepted by one who did own the interest so reserved?

We have already shown that at the time of the reconveyance by this last named deed, *the defendant had title to the undivided third part of the Burnett lot.* It was so in law. The parties to this last deed so themselves understood it, as appears by the grant and acceptance of the deed. This is also evidence that their *intentions* were in accordance with the law. To the extent of the interest which the defendant had in the property, *he could convey,* and his reservation was therefore to that extent valid and effectual. This was to an undivided third. In the view we have taken of the rights of

the parties to the first contract, we have held that the defend-ant had *title* to the lands in controversy, *without reference to the question whether or not there had been a delivery of the deed* from Gideon Payne and wife to the defendant. Suppose we have been in error in our view of this question of title in the *vendees* in such a case. It is then strongly urged by the plaintiff, that as this deed was only kept as an *escrow ;* that it was never delivered; that the title to the "Burnett lot" had not therefore passed to the defendant when he reconveyed it in 1848 to his father; and consequently, as he had no title to convey, he had none that he could reserve. Whether, when a deed is executed, and not immediately delivered to the grantee, but handed to a stranger to be delivered to the grantee at a future time, it is to be considered as the deed of the grantor *presently*, or as an *escrow*, is often a matter of some doubt; it generally depends more upon the *intent* of the parties, to be gathered from the words used and the purposes expressed, than from the terms they employ in naming the depositary, or from the name the parties give to the instrument. (*Foster* v. *Mansfield*, 3 Metc., 414.) "Where the future delivery is to depend upon the performance of some *condition*, it will be deemed an *escrow*. Where it is merely to wait the lapse of time, or the happening of some contingency, and not the performance of a condition, it will be deemed the grantor's deed *presently*." (Id., 415.) The parties in this case themselves, did not, in *terms*, call Herrendeen's holding of the deed an *escrow*. It is, therefore, left to the law to determine the character of his trust.

Looking to the language of the agreement itself, for the purpose and intent of this conveyance, it left no *condition* to be performed before delivery; it required nothing but the lapse of time, to wit, the death of both grantors, when Herrendeen, the agent, trustee or depositary of the deed (by whatever name he may be called), by *mutual* direction of the parties, not alone that of the grantor (who alone could not revoke a mutual agreement), *immediately to deliver it as a good and valid conveyance* of all the lands therein contained. If we look at the *intent* of the parties to the deed,

as manifested by their acts, independent of the language of their agreement, the one granting, the other accepting the grant of this part of the same premises, it is equally apparent that the parties intended the first deed as a present conveyence. In *Ruggles* v. *Lawson* (13 Johns., 285), A. executed a deed of lands, in consideration of natural love and affection, to his two sons, and delivered it to C., to be delivered to his sons in case A. should die without making a will, and A. having died without a will, C. delivered the deed to the sons; it was held that this was a valid deed, and took effect from the *first delivery*; that this was not an escrow. In *Tooley* v. *Dibble* (2 Hill, 641), a father signed and sealed a deed purporting to convey to his son a farm, placing the deed in the hands of B., with instructions to deliver it after the father's death, but not before, unless *both* parties called for it; and after the father died B. delivered the deed accordingly. It was held that the title of the son took effect by relation from the time the deed was left with B., and that the son's *quitclaim* executed intermediate the leaving the deed with B. and the father's death, though importing a mere conveyance of the son's "*right in expectancy*" in the land, would pass his title. The cases of *Goodell* v. *Price* (2 Hill, 659), and *Hunter* v. *Hunter* (17 Barb., 25), are but confirmations of this view of the title taking effect from the first delivery of the deed. In the case of *Belden* v. *Carter*, reported in 4 Day., 66, a deed was delivered to a third person to keep, and, if not called for, to deliver it after the death of the grantor. It was held, that by legal operation it became the deed of the grantor *presently*, and that the depositary held it as a *trustee* for the use of the *grantee*; that the title became consummate in the grantee by the death of the grantor, and the deed took effect by relation from the time of the first delivery. In the case of *Wheelwright* v. *Wheelright* (2 Mass., 447), a distinction is made which I regard as sound, and which I think has not been questioned since, that applies to this case. It was held that a deed signed, sealed, delivered and acknowledged, which is committed to a third person as the deed of the grantor,

to be delivered over to the grantee on a future event, is the deed of the grantor *presently*, and the third person is a *trustee* of it for the grantee. But if it be delivered to the third person as the *writing or escrow* of the grantor, to be delivered on some future event, it is not the grantor's deed until the *second* delivery, that is, its being a *present* deed depends upon the *fact* whether it was delivered as *an escrow*.

The cases can be multiplied, each varying from every other by some nice shade of difference, upon the question whether, in the present case, the deed was an *escrow* in the hands of the depositary, or whether the depositary was made the trustee of the grantor. In the former case, a second delivery is generally required before the title passes; in the latter, the title passes at the instant of delivering the deed to the depositary. This, I think, is the true distinction. In the case at bar there was no direction by the grantors that the deed was left as an escrow, and it presents no evidence of *intent* on the part of the grantors to make this deed an escrow. There is no condition mentioned in the agreement to be performed before delivery, which in law would create it an *escrow*, and presumptions arising from the language of the agreement being taken most strongly against the grantor, forbids any *implication* of its being an escrow. I think, therefore, that if the case depended upon *this point*, raised by the *plaintiff* on the assumption that there was no such delivery of the deed of 1839 as to pass the title to the defendant, he must also fail.

There is another reason which exists both at common law and by the statute (which adopted the common law in this respect), which is controlling, "that in the construction of every instrument creating or conveying any estate or interest in lands, it shall be the duty of courts of justice to carry into effect the intent of the parties, so far as such intent can be collected from the whole instrument, and is consistent with the rules of law." (2 R. S., 748, marg. pag.; *Darling* v. *Rogers*, 22 Wend., 489.) Following this rule, it is most clear, from the conveyance of the defendant to Gideon Payne in 1848, and the acceptance of such conveyance by the latter,

that the parties themselves intended to make a good conveyance ; the grantor reconveying the title to the undivided third of the " Burnett lot," *reserving* not only rights and interests pertaining to the one-third portion that he did own, but to the other two-thirds that he did not own. The grantee accepted such conveyance, subject to such reservation upon the whole lot. The consideration expressed in this deed of one-third of the Burnett lot, was a good and a valuable consideration. The deed expressed the consideration of one thousand dollars, *and the enjoyment of the reservation therein contained,* the enjoyment of which reservation was expressly declared to be a part of the consideration for the conveyance. The intent of the parties is clearly manifest. It is for exercising the claimed right to enjoy these reservations, that this action is brought. This raises the next question that we propose to discuss.

It is argued that title to the whole wood on the Burnett lot was not *granted* by a *reservation* in a conveyance by the owner of only an undivided third of the same lot, even if he had title to that third. It must be borne in mind that the grantee in this deed was the owner of the other two undivided thirds of this lot. It is true it was not an *indenture,* and signed by both parties, but a deed poll, signed only by the grantor. It is true, also, as a general rule, in law and in logic, that a man can neither *grant* or *reserve* the title to that which he hath not in himself to grant or to reserve. While this is so, I do not understand that the defense to this action is based on the ground of its being a grant, but on the ground that even in a deed poll, given for a valuable consideration, the grantee, who was the owner of the estate or interest so reserved, who receives the consideration and accepts the deed containing reservations or stipulations which could only be granted by himself, is bound by such stipulations or reservations, especially if such appears to be the intent of the parties to the deed. He cannot deny the title of his grantor. This was established law as long ago as the day of Littleton. (§ 374.) Whereupon Lord Coke says : " And albeit, he in remainder be no party to the indenture, yet when he in remain-

der entereth and agreeth to have the lands by force of the indenture, he is bound to perform the conditions contained in the indenture." (Co. Litt., 231, A; 1 Eq. Ca. Abr., 21, § 10.)

In the case of *Brett* v. *Cumberland*, reported in Cro. Jac., 522, which was a lease from the Queen to Cumberland, to which her seal *only* was affixed, and in which there was a stipulation that the lessee should well and sufficiently *repair* and *keep repaired* the *mill and mill stones* therein, the lessee died, and devised the estate to the defendant, against whom an action of *covenant* was brought for not *repairing*, &c. The question was, whether the words in the patent signed only by the queen as lessor, should inure as a covenant to bind the lessee and his assigns; and it was resolved that it should, for the lessee takes thereby, and " although in *shew*, they be the words of the lessor only, *yet he accepting thereof and enjoying it*, it is as well his covenant in *facto*, and shall bind him as strongly as if it had been a covenant by inden- ture." The same principle may be found in the following cases in the courts of this country. (*Phelps* v. *Townsend*, 8 Pick., 394; *Flagg* v. *Flagg*, 11 id., 475; *Arthur* v. *Case*, 1 Paige, 449; *S. C.* in error, 3 Wend., 636; *Torry* v. *Bank of Orleans*, 9 Paige, 660, 661; *Gale* v. *Nixon*, 6 Cow., 448; *French* v. *Cachent*, 1 Comst., 103.) There is another rule recognized by the courts, which will ever be regarded with · favor for the purpose of carrying into effect *the intention* of the parties to instruments of this character, and to secure the just rights of the parties; that is, that a party who has secured to himself the benefit of a contract, and has accepted and used these benefits, has *estopped* himself in the courts from *denying* the validity or binding force of the instrument, or from setting up or asserting to the contrary. (*Dezell* v. *Odell*, 3 Hill, 216, 221; *Thomas* v. *Bell*, Hill & Denio, by Lalor, 433, 434; *Costar* v. *Brush*, 25 Wend., 628; *Plumb* v. *Cattaraugus County Mutual Insurance Co.*, 18 N. Y., 394; *Welland Canal Company* v. *Hatheway*, 8 Wend., 483; *Otis* v. *Sill*, 8 Barb., 102; *Lawrence* v. *Brown*, 1 Seld., 395.)

In any view that I have been able to take of this case, whether the defendant is to be regarded as the exclusive

owner of all the wood upon the said Burnett farm, or only of such part as becomes dead or decaying, blown or fallen down, or whether he is only tenant in common of the undivided one-third part of such wood, his right to enter the said premises is limited to the express reservation contained in his deed, that is, "*to cut and take away the dead and decaying trees.*" He has conveyed away all right to enter the said premises for any other purpose. His entry to cut living and sound trees was therefore a trespass; he had no more right than a stranger to enter for that purpose. And although the plaintiff can recover for no other damages than for the damages occasioned by the entry, and for such damages as he can show he has sustained by the use of these standing live trees for ornament, for shade, for protection, or such other use as is beneficial to him during the time they remained sound and living trees, he has the technical right to recover, and was entitled to such damages. As this right was merely nominal, this court would not have reversed the judgment except that the record might be used in another action as an adjudication between the parties in relation to the title, and used as a justification and defense in some subsequent action for a like trespass. For this reason the judgment must be reversed and a new trial ordered.

DENIO, Ch. J. The deed of the 14th February, 1848, executed by the defendant to Gideon Payne, certainly conveyed to the latter whatever title the grantor had in the lands described in it. The deed executed by the executors of Gideon Payne, under the power contained in his will, vested that title in the plaintiff.

Assuming, then, for the moment, that the defendant was seized of the lots immediately prior to the execution of the deed — which is the most favorable condition for the defendant; and assuming, further, that the stipulations respecting the fallen and the dead and decaying trees are valid and operative according to their natural meaning, what right had the defendant to cut and carry off the ten living trees? They were growing upon the land in the plaintiff's possession, and

of which he was seized in fee; and the stipulations in the deed not only do not permit the defendant to touch them, but they expressly prohibit him from doing so. It was a plain act of trespass, without a pretense of right, and whether the damages were great or small, the plaintiff was entitled to have them assessed by the jury; and, hence, the judge fell into an error in nonsuiting him. If the defendant could cut down and carry away the ten trees with impunity, he could do the same immediately with every tree on the whole fifty acres of wood land; and this judgment, if it shall be suffered to stand, will completely justify him in doing so. It is no sufficient answer to say, that the land in forest will not be valuable to the plaintiff if he is not permitted to take off the timber and wood himself, but is obliged to let it stand until the trees shall blow down and decay, and then suffer the defendant to take them to his own use. It was for the owner of the land to determine whether he would have his wood lot converted into arable land or not. In some parts of the State it would, perhaps, be beneficial to the owner of forest land to have it cleared of the timber, even if it were taken off or burned up; but, nevertheless, any one who should volunteer to do it without the consent of the owner of the land would be a wrongdoer, and would subject himself to an action for damages. This view would lead to the reversal of the judgment, however the other questions should be determined.

But as this action seems to have been brought for the purpose of settling the rights of the parties respecting this forest land, it is proper that we should examine the case in another aspect.

The positions of the plaintiff's counsel are, first, that the defendant, not being the owner of the land on the 14th February, 1848, when, in connection with his wife, he assumed to convey it to Gideon Payne, the testator, he could not reserve to himself, or make a valid exception in his own favor, of rights in perpetuity in or over the land; and, secondly, that if he were such owner, an exception or reservation of the character of the one contained in- this deed would be repugnant to the grant, and void for that reason.

As to an undivided two-thirds part of the premises, the defendant had no pretense of legal title. It was parcel of the arrangement entered into between the testator and his son, the defendant, of the 25th November, 1859, that the latter should have the use and control of these two-thirds of the premises in question for some indefinite period, and that, whenever he should pay the testator two thousand dollars, he should have a conveyance from him of that portion of the premises. The interest thus acquired did not exceed that possessed by a vendee under articles of purchase. As to the one-third part covered by the deed signed and sealed by the testator on the same day, the question is, whether any title passed to the defendant by that deed. It was not delivered to the defendant, the grantee, nor to any one as his agent or for his immediate use; but it was placed by the testator in the hands of E. Herrendeen, a third person, there to remain during the lifetime of the said testator, and then to be delivered to the grantee. The defendant was to have the immediate use and control — that is, the possession — of this part; but he bound himself to surrender that possession, if, and whenever, he should make default in providing support and maintenance for the testator and his wife, according to his agreement in that behalf. Nothing could be further from the intention of the parties than that a legal title should vest in the defendant, upon the signing of the paper and delivery of it to Herrendeen. If it should so vest, the defendant might convey or incumber the premises, and thus frustrate the other provisions of the arrangement. They contemplated that nothing would be necessary to restore the testator to his former rights in the land except the surrendering of the possession by the defendant to him. If the title did not pass, as they clearly designed it should not, no reconveyance, or other act, save the redelivery of possession,. would be necessary. This was the situation of the title to the undivided one-third, unless, under some rule of law, a title immediately passed to the defendant, contrary to the obvious intention of the parties. The defendant's counsel accordingly maintains that the effect of what was done was the immediate transmission of the title

to the defendant; or, if that position cannot be established, that an inchoate title passed, which became absolute after the death of the grantors, when Herrendeen delivered the instrument to the defendant.    The cases referred to fail to maintain the first branch of the proposition.    They do, however, I think, prove that a deed may be delivered to a third person, as this was, with instructions to be finally delivered to the grantee after the death of the grantor.    In such a case, the weight of authority is, that no title passes until the final delivery, and that then, and thereafter, the title is, by relation, deemed to have vested as of the time of the first delivery to the third person.    If it were an original question, I should suppose that such a transaction was of a testamentary character, and that it would be inoperative for want of the attestation required by the statute of wills.    But the cases establish the rule as I have stated, and they should not now be disturbed.  (*Jackson* v. *Rowland*, 6 Wend., 669, 670; *Ruggles* v. *Lawson*, 13 Johns., 285; *Stillwell* v. *Hubbard*, 20 Wend., 44; *Tooley* v. *Dibble*, 2 Hill, 641, 643; *Goodell* v. *Price*, id., 659, 661; *Hunter* v. *Hunter*, 17 Barb., 25; *Stewart* v. *Stewart*, 8 Comst., 317; *Ladd* v. *Ladd*, 14 Verm., 185; *Norton* v. *Mansfield*, 3 Metc., 412; *Wheelright* v. *Wheelright*, 2 Mass., 447.)

The principle thus established would show the defendant to have been seized of these premises — that is, of the undivided third — at the time of the cutting of the trees, but for his deed executed to the testator in his lifetime.   At the date of that conveyance, the deed of 1848 had not taken effect, and the period had not arrived at which it was to operate to pass the title by a delivery to the grantee.   But it was competent for the parties grantors and grantee in the deed to put an end to the agreement by which it was to be delivered in a manner to affect the premises in question.   A different arrangement was made, by which the testator, and not the defendant, was eventually to have these premises.   By that arrangement, as manifested by the terms of the deed of February, 1848, the defendant was to, and he did, release and convey to the testator all his estate, right and title of every description,

TIFFANY—VOL. VII.        15

which he had in the premises in question, reserving his growing crops and the right of possession until the first day of the ensuing November. By a further provision, he also reserved, if he had power to do so by that instrument, to himself and his heirs and assigns, in perpetuity, that is, in fee simple, at all times to take and carry away all the trees on the premises that should thereafter be blown down, all that should die, and all which should be in a decaying condition; but he was not to cut down any growing trees; and, in order to protect the right to those which should thereafter fall or be dead or decayed, the grantee was equally inhibited from cutting any growing trees. The effect of the provision was, that the wood land on the lot was to be kept perpetually in forest, so far as the hand of man was concerned, and that the consequence of the destruction of the trees by age, natural decay or the elements, was to give the defendant, and his successors in the title, the property in the wood of the trees thus destroyed. Assuming that such an arrangement, made by competent parties, in due legal form of law, would be valid and operative, the question now to be considered is, whether the defendant had such a title that he could secure to himself such rights by a reservation or exception in a deed-poll. Considered as an exception, it would, no doubt, be operative upon the dead and fallen timber then upon the lot. That, so far, certainly, as regarded the fallen trees, would be personal property, and would belong to him in right of his possession and enjoyment of the premises under the former arrangement.

But in respect to the future, and to trees then growing, but which should thereafter come within the scope of the provision, I am of opinion that the defendant had not such a title, either on the footing of an exception or a reservation. The defendant, having no title, could not of course convey any, and not being able to convey a title, he could not secure one to himself by way of exception or reservation. An exception must be parcel of the thing granted, and a reservation must be of some new right over or in the thing granted, which the grantor was competent to create and attach to the seizin of the premises. The question is the same as though the defend-

ant had assumed to grant to some third person a perpetual right in the trees on this forest land of the kind of that mentioned in the reservation in this deed. Such a grant would be inoperative for the want of title in the grantor, and a right which a person cannot grant for want of title he cannot reserve to himself for the same reason. The effect of the deed, under the existing facts, was to release the grantee's right to the possession, and his equitable interest under the covenant which enabled him to purchase the two-thirds on the payment of two thousand dollars. It had also the effect, incidentally, to abrogate the arrangement by which the title of the one-third should vest in the defendant by the delivery of the deed in the possession of Herrendeen after the death of Gideon Payne and his wife. I do not conceive that it had any effect in respect to the other parcel of land embraced in it. The new arrangement was limited to the Burnett lot on which the trees were cut, and did not touch the portion of the premises which were parcel of lot No. 63. It was quite right, therefore, for Mr. Herrendeen to deliver the deed after the death of the last survivor of the grantors; but under the circumstances that delivery had no operation in respect to the Burnett lot.

The position that one cannot take under an exception or reservation to himself, a thing which he could not grant for want of title, seems obvious enough on general principles, and it is moreover well settled by authority. In *Moore* v. *The Earl of Plymouth* (3 Barn. & Ald., 66), one Windsor, having an equity of redemption, joined with parties who were seized of the premises, subject to that equity of redemption, in a conveyance by bargain and sale to parties under whom the defendant claimed, reserving to Windsor and the heirs of his body, free liberty of hawking and hunting out of and upon the premises. The defendant, who was the heir *in tail* of Windsor, undertook to exercise the right reserved, and the owner of the land, under the conveyance, brought trespass *quare clausum;* and the facts appearing from the defendant's plea, judgment was given for the plaintiff on the ground that Windsor, the party making the reservation,

had no legal estate in the land. In *Cornell* v. *Todd* (2 Denio, 130), a person under whom the defendants claimed, on the same day conveyed to the plaintiff and another, two separate but adjoining parcels of land, one of the deeds *excepting and reserving* to the grantees, by a definite description, a portion of the premises included in it. It fell out that a portion of the parcel described as excepted, was a part of the land embraced in the other deed. It was held that the two deeds could not be considered as parts of one and the same transaction, and the case was therefore presented of a grantor attempting to reserve to himself a subject not conveyed by the deed in which the exception was contained. In trespass for an entry by the defendants upon the excepted part, it was held that the plaintiff was entitled to recover. These cases show that a person cannot, either by way of reservation or exception, secure to himself a title in or to real estate, of which he was not seized at the time of making the conveyance. Hence I am of opinion that the defendant had not, after the conveyance to the testator, such a title to the trees standing on the premises as would enable him to cut and take them away, though they should die, decay or be blown down.

If my brethren should concur in both or either of the foregoing conclusions, it would be unnecessary to examine the remaining questions. My opinion is, that a person seized of an estate of inheritance may convey it with such a reservation as is contained in this deed, and that the grantor would have a fee simple estate in the right reserved. No doubt such an interest would be inconsistent with the absolute ownership which the other terms of the deed would denote, and in that sense there would be a repugnancy. But similar reservations in deeds in fee have often been sustained in our courts. (*Dygert* v. *Mathews*, 11 Wend., 35; *Case* v. *Wait*, 3 Wend., 632; *Borst* v. *Empie*, 1 Seld., 33; *Jackson* v. *Lawrence*, 11 Johns., 191.) The case of *Craig* v. *Wells* (1 Kern., 315), only decides that a restriction in a grant in fee of the uses which the grantees shall make of the premises is void as repugnant to the estate granted. If the grantor had reserved .to himself the rights which he prohibited the grantee from

Opinion of the Court, per DENIO, Ch. J.

exercising, it was conceded that the reservation would have been valid.

I am in favor of reversing the judgment appealed from, and ordering a new trial.

On the first and principal ground, DAVIES, WRIGHT, DAVIS, BROWN and PORTER, JJ., concur with DENIO, Ch. J. On the other points discussed, WRIGHT, DAVIES, PORTER and BROWN, JJ., were with POTTER, J.

CAMPBELL and POTTER, JJ., dissented from the judgment of this court.

Judgment reversed.